Thomas O. JONES, Appellee,

v.

MANAGEMENT AND COMPUTER SER-
VICES, INC., Pentamation Enterprises,
Inc., Jeffrey P. Feather, Joseph Sulli-
van, David Bloys and Charles Wistar,
Appellants

No. 91–1911.

United States Court of Appeals,
Third Circuit.

Argued May 20, 1992.

Decided Oct. 8, 1992.

Edward T. Lawlor, Jr. (argued), Curran, Winning & Fioravanti, P.C., Media, Pa., for appellee.

E. Jerome Brose (argued), Charles W. Elliott, Brose, Poswistilo, Elliott & Elliott, Easton, Pa., for appellants.

Before: HUTCHINSON, COWEN and SEITZ, Circuit Judges.

OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendants appeal from a judgment against them in a stockholder's derivative action controlled by Pennsylvania law. The district court's jurisdiction was based on diversity of citizenship and ours arises because the appeal is from a final judgment.

I. FACTUAL BACKGROUND

Plaintiff is a minority stockholder of Management and Computer Services, Inc.

("MACS"), which was a competitor with Pentamation Enterprises, Inc. ("PEI") in the processing service area of the computer services industry. PEI's president, Jeffrey P. Feather, had spoken informally to Francis A. Schlegel, the principal officer and an approximately 85% shareholder of MACS, of PEI's interest in acquiring MACS. When MACS was faced with the possibility of not meeting its payroll in May of 1981, Schlegel contacted Feather and entered into negotiations which led to the execution of three agreements, all dated June 12, 1981.

By the first agreement ("License Agreement"), which was to be fully implemented by October 1, 1981, MACS granted to PEI exclusive and permanent worldwide licenses to two software systems entitled "DATAMACS" and "SYSTEMACS." MACS and PEI were not competitors in the area where these marks were employed. MACS also agreed to take the necessary steps to "perfect" the assignment to PEI of its interest in the trademarks DATAMACS and SYSTEMACS by filing the requisite documents with the United States Patent Office. In return, PEI paid MACS $125,000. In addition, it paid $125,000 to Provident National Bank, a secured creditor of MACS, for an assignment of MACS' loan obligation. MACS was granted a limited time to withdraw from the License Agreement under certain conditions. Finally, MACS represented in such agreement that its Board of Directors authorized the License Agreement and agreed to call a special meeting of its stockholders to ratify the action of its Board. It is not challenged that such ratification took place.

By the second agreement ("Employment Agreement"), PEI contracted to employ Schlegel to manage marketing and sales of the Software Products Division of PEI (to be established), or the existing Proprietary Software Products Division of MACS. That agreement further provided that Schlegel's employment would commence on August 1, 1981, or earlier if PEI exercised the option it was granted in the third agreement. The agreement was for a five-year term with a base salary of about $70,000 a year plus incentive consideration.

The third agreement ("Stock Option Agreement") granted PEI the option to purchase Schlegel's stock ownership interest in MACS at five cents a share or a total price of $12,005. PEI exercised the option granted it by Schlegel under the Stock Option Agreement in July of 1981. Such action triggered the terms of the Employment Agreement with Schlegel. PEI then made a tender offer for additional minority shares, and thereafter owned 92.49% of MACS.

PEI did not establish a Software Products Division; rather, it continued to market DATAMACS and SYSTEMACS through the Proprietary Software Products Division of MACS. Thus, Schlegel, as an employee of PEI, continued to manage and market all of the products originally manufactured by MACS as he had done prior to the execution of the three agreements in 1981.

MACS was not operating profitably at the time the various agreements were executed. Indeed, it lost money in the years 1981–1985. Moreover, PEI advanced very substantial sums to MACS during the same period.

In 1984 MACS, denominated as a division of PEI, commenced an action against, *inter alia*, Apple Computer, Inc. for trademark infringement on several trademarks coming within the family of MACS marks. Included in these trademarks were DATAMACS and SYSTEMACS, the subjects of the License Agreement. The infringements allegedly commenced in January of 1984. The Apple action was subsequently settled for $850,000 and the net proceeds were allocated, pursuant to an identified formula, 60 percent to PEI and 40 percent to MACS.

On September 30, 1985, Computer Associates International, Inc. ("Computer Associates") entered into two separate agreements of purchase, one with PEI and the second with MACS. By its agreement with PEI, Computer Associates acquired the DATAMACS and SYSTEMACS trademarks for $1,687,500 plus "earnout" royalty payments for five years. By its agreement

with MACS, Computer Associates acquired certain identified licenses along with additional assets of MACS for $562,000, plus certain contingent payments.

Other facts will be developed in connection with the disposition of the issues to be decided.

## II. DISTRICT COURT DECISION

Thomas O. Jones ("plaintiff"), a minority shareholder of MACS, instituted this derivative [1] action against MACS and PEI, along with Feather, PEI's majority shareholder, as well as four individually named officers of MACS and/or PEI.[2] He alleged that the defendants committed certain frauds and breaches of fiduciary duty flowing from PEI's conversion of certain assets of MACS to the detriment of its minority stockholders.

Thereafter, by agreement of the parties, a non-jury trial was held before a magistrate judge ("court"). The court subsequently filed what is captioned "Findings of Facts and Discussion of Law," dated October 12, 1988. It concluded:

> The plaintiff has made out a prima facie case of corporate overreaching and possible fraud in diverting some of the funds from the law suit against Apple and from the sale of the financially productive and profitable MACS, Inc. systems. What other evidence there is will have to be developed after a complete accounting. For this purpose, an independent accounting firm will be appointed. The mission of the accounting firm will be to develop yearly reports of the years starting with the year prior to the sale by the majority shareholder and every year thereafter.

The court entered an order thereon in which it directed "that an accounting be made to the court in accordance with the attached Findings of Fact and Discussion," and that, after a further hearing, findings and a decision would be made. The accounting firm filed its report on February 12, 1990, purportedly to implement the court's directive. The trial then resumed.

The court filed "Additional Findings of Fact and Conclusions of Law" on December 20, 1990, in which it concluded that the defendants violated the fiduciary duty they owed the minority shareholders. Based on the court's additional set of Findings and Conclusions, it directed the accounting firm to reexamine the conclusions in its earlier accounting. After receipt of the revised accounting, the court filed Further Findings of Fact and Conclusions of Law. Based thereon, it entered judgment for MACS and against all the defendants[3] in the sum of $2,491,659, plus counsel fees to plaintiff.

This appeal followed. We review challenges to factual findings under a clearly erroneous standard. Our review of legal issues is plenary.

## III. THE LICENSE AGREEMENT

The keystone of the court's analysis in this action is found in its ruling that the License Agreement was void as to plaintiff because of certain breaches of fiduciary duty by PEI.[4] In its initial and so-called prima facie ruling the court seems to have indicated that the License Agreement was void from its inception because, in its view, the DATAMACS and SYSTEMACS systems were never legally transferred to PEI. It apparently based its view on the fact that PEI left these marks, as in the past, as part of the same division of MACS and used them in the same way. In addition, it points out that the assignments of

---

1. He also sued individually but we need not address that claim since no individual relief was granted and plaintiff did not cross appeal.

2. These officers were Messrs. Feather, Sullivan, Bloys and Wistar. Schlegel is not named as a defendant.

3. Since this was a derivative action for the benefit of MACS, we presume that the court inadvertently included MACS, a nominal defendant, in the judgment.

4. At some point in its rulings, the court seems to have treated the License Agreement as though it were between Schlegel and PEI, perhaps because Schlegel was the majority stockholder of MACS. Clearly, in law, the agreement was between MACS and PEI.

the marks were not perfected. However, in its final opinion on the merits, the court held the License Agreement void as to plaintiff "because of a breach of the fiduciary relationship to which PEI participated."

Defendants argue that the court changed its final theory of liability from that found in its first ruling. Given our view of the controlling law, we think it would be unprofitable to pursue the consequences of that argument.

■ It is a deeply imbedded general principle of contract law that the validity of a contract is to be determined as of the time it is made. Here the court relied on certain factors to support its conclusion that the License Agreement was void because of certain conduct of PEI. Thus, it relied on the failure of PEI to cause MACS to call stockholders' meetings, to pay dividends, to keep separate books for MACS, and to cause MACS to file documents in the Patent Office to perfect the transfers of the DATAMACS and SYSTEMACS trademarks.

It is evident that the facts relied upon by the court all related to the period after the License Agreement was made. Whatever their legal consequences, they did not impugn the validity of the License Agreement at the time it was made.

■ Nor is there any merit to plaintiff's claim that PEI "waived" the terms of the License Agreement by permitting the licenses to remain with MACS. MACS received full consideration for the marks when the agreement was made. Whether the allocation of profits and expenses in the operation of MACS was fairly made was a separate matter. It did not impugn the validity of the License Agreement.

■ So far as this record shows, MACS and its majority stockholder were in an arm's length posture as to PEI when the License Agreement was negotiated. Furthermore, and of great significance, there is no finding by the court that the payments made by PEI to MACS for the two trademarks did not represent their fair value. Under such circumstances, there can

be no basis for the court's conclusion that PEI participated in a breach of fiduciary duty in executing the License Agreement.

The court did state:

As part of the consideration, the majority interest was offered a position with PEI to manage the two (2) systems (Datamacs and Systemacs) that it was interested in.

It is not clear what significance the court attached to this finding. If it was intended to imply that PEI, as part of the total transaction, was involved in some form of conspiracy with Schlegel to benefit him at the expense of MACS, the simple answer is there is no record basis here for finding that the sale price for the marks did not reflect their then fair value, apart from the consideration flowing to Schlegel from the Employment Agreement. Thus, the court's conclusion that PEI participated in some breach of fiduciary duty that was owed to plaintiff as a minority shareholder must fail whether it be considered a finding of fact or a conclusion of law.

■ It is understandable that the court's judgment may have been influenced in part by the large disparity between what PEI paid MACS for the two trademarks in 1981 and the amount PEI realized from the sale of the marks to Computer Associates in September of 1985, along with the portion of the proceeds PEI received from the Apple settlement. But such a later consequence of an arm's length transaction does not retroactively impose a fiduciary duty on PEI, particularly in the absence of any finding that the "sale" price was legally inadequate in 1981. Indeed, if relevant here, there may be reasonable explanations for the increase in the value of the marks. For example, the infusion of over $3,000,-000 by PEI into MACS in the 1981–1985 period could account, in part, for the increased value of the assets.

Based on its conclusion that the License Agreement was invalid, the court determined that the DATAMACS and the SYSTEMACS marks "sold" to PEI remained the property of MACS and that, as a result, MACS was entitled to the income

generated therefrom. Of sequent importance, it held that the portion of the proceeds received by PEI from the Apple settlement belonged to MACS, as well as all of the proceeds received by PEI from the sale of the DATAMACS and SYSTEMACS marks to Computer Associates.

The court clearly held that MACS was entitled to all of the foregoing income and proceeds because of its conclusion that the License Agreement was void. Since we have concluded that the License Agreement was valid, it follows that the court's allocation of all such proceeds and income to MACS must also fall. Our conclusion is not altered by the fact that PEI continued the use of the marks obtained in the License Agreement through a division of MACS. We say so, once again, because that action did not affect the validity of the License Agreement. Rather, it required a proper allocation of income and expenses between MACS and PEI in the continuing operation of that division. The propriety of such allocations was the subject of the independent accounting firm's first report which essentially supported defendants' position. The correctness of that report is not an issue on this appeal.

The final judgment granted plaintiff no relief apart from the monetary award in favor of MACS. Thus, although plaintiff sought additional relief based on other alleged improper conduct by PEI in its relations with MACS after the execution of the License Agreement, those matters are not before us since plaintiff filed no cross appeal.

Our conclusion necessarily vitiates the award of counsel fees to plaintiff.

## CONCLUSION

The judgment of the district court will be reversed with a direction that it enter judgment for the defendants. The parties shall bear their own costs.